Mr. Young, you may proceed. Thank you. Please, the Court. My name is Damon Young. I represent Petitioner Joseph Alford in this case. And again, please don't read anything into our questions as to how we might decide. Yes, Your Honor. Good. All right. Procedural history is that the Petitioner, or this case was tried on a 19B in front of Arbitrator Holland, and I believe Arbitrator Giordano had decided the case. And the issues were accident and causation and prospective medical TTD. The Arbitrator found against the Petitioner, and this was appealed to the Commission, who reversed the Arbitrator and found this case, or found causation, an accident, and awarded prospective medical and MRI and TTD benefits. Cert court reversed, and today, based on the Commission decision, I believe the standard review is manifest weight, and the Commission decision was based on, I believe, The accident occurred when the Petitioner was working as a detailer for the Respondent. He had been working a certain job, and his testimony states that he had moved to a different section of the detailing shop, and was cleaning tires, which necessitated the use of soap and water, and he was also cleaning the interior, which means he had to go in and out of the interior. While he was working, he slipped and stated in testimony that he had jarred his back and injured his back. He didn't fall, but he fell onto the car when he hurt himself. Let me ask you this. The Commission determined that the claimant testified credibly. Was there any dispute regarding the claimant's testimony of his job duties, the circumstances surrounding the accident? Did anybody disagree with that? No, there was nobody that testified on behalf of the Respondent in regards to the accident, and also, there were specific facts that he had stated that he just came from a day off, that he had changed job duties that day because certain people had missed work, and if there was a dispute in the accident, they could have brought a witness in to hear his testimony and refute the testimony, because they tried to infer in the brief and in their arguments that he didn't even know the accident date, but it's clear from the follow-up first medical visit, he stated that he had injured his back while he was working as a detailer, and that was January 24, 2011. After he treated for about a month of chiropractic treatment, he was not getting any better, and he notified his employer. The reason he delayed in his notification was that he had had some friends and family that dealt with the workers' compensation system, and he had thought that he only had a minor back injury, so he was hoping that a little bit of chiropractic treatment would get past his back strain, and then he would not have to notify his employer and go and file a workers' compensation claim. But since his condition worsened, he had to follow up with a medical doctor, Dr. Stetter, at an occupational medicine facility, and he treated there and also IPMR for physical therapy. Let me ask you some candid questions. You don't have any medical doctor giving a cause of connection opinion, correct? What, not a specific cause of connection opinion, right. No, absolutely. So this sort of proceeded on a chain of events analysis, correct? Absolutely right. Supporting the cause of connection. Yes. I'm sure as Mr. Elwood is going to jump up and point out, Dr. Hauter, you know, the doctor with the credentials is going to give an opinion that the cause of connection is not supported here. So, and I think we know that even though there's a medical opinion refuting causation, the commission is not legally obligated to adopt it, even in the absence of conflicting medical opinion. But what's wrong with Hauter's opinion? I think there was multiple problems with his opinion. First off is that he states in his opinion that the petitioner stated that he heard himself started to have back problems at home. When I read the history of the IMU report, it doesn't state that he started feeling problems having back problems at home. It actually stated he started having problems that evening. Also, as you read it closely, he gives a wrong accident date within the report itself. He has an accident date of April 23, 2009. He also states that the initial treatment records don't state that there was a trauma. Yet the initial treatment records on January 24, 2011 states that he hurt himself while detailing a car. And he, after a physical examination, he diagnoses the petitioner with a central nervous system disorder, possibly multiple sclerosis. And then states all the reasons why. And then also states that he thought that the petitioner was not consistent with his pain complaints. So that doesn't explain the symptoms that the petitioner was having was, in Dr. Hauter's opinion, was multiple sclerosis. Yet that showed that he was having inconsistent pain complaints. What's the first date that it appears in any medical records that this man claimed that he had a back injury as a result of wet floors at work? Wet floors at work or detailing a car? Either. Okay. Detailing a car is January 24, 2011, roughly a week after the accident. He does give a specific history on March 1, 2011, to Dr. Stetter, where he was working on a wet floor and he had roughly 200 slips that day. You're talking about the January 24th records of Richardson? Yes, Your Honor. Strain mid-back from car, detailing job on wet floor, early part of January, 2011. Yes, Your Honor. And then Stetter, March 1, 2011. Yes, Your Honor. That was where he had given a history. Has he ever given a history to any medical provider other than I was injured when I was detailing a car or slipped on a wet floor? Well, it's unclear from the first January 24th record is that he also states that he started to have back problems after he was sick. But in the specific record, that same record, it does specify that he hurt himself at home. Did he testify or did any medical provider testify that this association with being sick was more timing-wise as opposed to causation-wise? In other words, he was associating the onset of the back symptoms to the time when he was sick or was it as a result of being sick? He was vomiting or something and he had back spasms after that. Because it wasn't clear what I saw in the briefs. Right. I think he did testify that he was sick and then he had a day off and then he came back to work. So I think what happened was he was, one, his dad wrote in there that he had the flu on the intake questionnaire with Dr. Richardson, the chiropractor. And then, two, I do believe that he, from his testimony, that he was using that time frame to narrow down when he was injured on January 17th, 2009. So you're saying that the flu part of this was a temporal association as opposed to a causation association? Yes, Your Honor. And then one other thing. In terms of Dr. Howder's diagnoses, I think Mr. Elwood has attached in the appendix to his brief Dr. Howder's report of July 12th, 2011. Lumbar muscle sprain is one diagnosis. Central nervous system disorder is a separate diagnosis. Did Dr. Howder ever testify that he associated the back complaints with a potential central nervous system disorder? Or did he always separate these two diagnoses and the symptoms and signs associated with these two different disorders? Right. He did, he testified, I'm sorry, in the report it states that he had, there was a back strain, but he doesn't, from my reading of the report, it doesn't explain how he got the back strain, sprain. But the symptoms that he, or the petitioner was having at time of the IME was he related to the central nervous system issues he felt that he had. What symptoms, though? I think he had an issue with the eye during the physical exam. He had some shaking and he came in in a wheelchair for the IME and he related those symptoms to the central nervous system issues that he thought he had. So it doesn't appear that Dr. Howder ever associated or related the climate's back symptoms to a potential central nervous system disorder? No, I don't believe so. Okay. But then again, that's why I don't believe Dr. Howder's opinion is credible, because he diagnosed the petitioner with a back strain, but doesn't explain how he got that back strain. You know, we're given the same problem we had with the last case. The fact that the commission chose to find a causal connection based upon a chain of events does not mean that Howder's testimony is incredible. It only means that they have chosen the chain of events theory over his testimony because it's conflicting. Manifest weight doesn't mean there's one right answer. It means either answer could be correct. The question is, is there competent evidence in the record to support the conclusion reached by the commission? And this is a chain of events theory. They didn't like Howder's testimony because they said, he largely based his causal connection opinion on the fact that the claimant had several mini slips and could not identify one event that started the problem. But the claimant's testimony that he slipped on numerous occasions and tweaked his back with each slip, however, leads us to conclude that the claimant suffered a back injury. And every medical record, he testifies he had this problem. And he also testified that other than some remote automobile accident, he never had any back problems. Correct. Yes, Your Honor. So now we've got chain of events on one side, Howder on the other side, and the commission says, we choose chain of events. Yes, Your Honor. I believe that they were correct in that. And with the manifest way of the evidence, I believe it shouldn't be overturned. Could the mini slips be characterized as repetitive trauma, even though it occurs in the afternoon or the morning? Right. I think from reading the testimony and taking that into consideration with the medical records, is that he was asked, what were you doing that day? And there was soap and water on the floor. And he estimated that he slipped that many times because he was working and he slipped. But he also stated that there were slips that he felt back pain with. So I think that's why it wouldn't be repetitive trauma, is that he had specific slips where he injured himself, but he also had numerous slips throughout the day when he was working. So he didn't say each slip had a strain on his back? No, he didn't. Yeah, right, Your Honor. I'm sorry, is that the end of the question? Right. He didn't say that because of 200 slips, I had back pain. He said because of specific slips, numerous slips, I felt pain in my back. So in any event, he was consistent in relating his injuries to slipping on the floor. Yes, Your Honor. That's what he was testifying to. Yes. Let me ask you something, and I'm sure Mr. Elworth is going to raise Dr. Hauter's findings. Specifically, Dr. Hauter determined that records of the initial treatment at the chiropractor did not mention a trauma, which is one of the bases for his opinion. However, didn't the records actually reflect the claim reported that he strained his back from car detailing on the wet floors in the early part of January? Didn't he mention that that was the cause? Absolutely, Your Honor. So do we know where Hauter came to the conclusion that he never mentioned at the initial treatment a trauma? Well, I guess the initial treating record doesn't say that I slipped one time while I was picking something up or scrubbing a tire and felt a pop in my back. So I guess that there was no specific trauma. I'm just guessing, and that's why I don't believe that Dr. Hauter's opinion is credible or persuasive. I'm sorry. It's something else. Absolutely. I wouldn't say it's incredible. That's true. Yes, Your Honor. Mr. Elworth, you may respond. Thank you. On behalf of Morton Auto Auction, we have the unusual position here of being an appellee, but really we're trying to overturn the Commission's decision. So it puts us in a little bit different perspective on how we present this case. I had originally thought about approaching it one way, but based on the Court's questions, I think we need to be clear here that, of course, we're asking that the Commission's decision be set aside. We think it is against the manifest way of the evidence, and I'd like to identify why. But before I do that, there are really two issues here. There's the accident issue, which goes into whether or not, you know, how do we view the findings in the chiropractor's report and the contention of the 200-plus minislips, et cetera. And then we have the issue of causation. And, Your Honor, you asked a question earlier, and you did at the opposing counsel, or in the case just before us, you said we're supposed to look at this with any competent evidence. I think in a worst-case scenario for me, if you look at this case and say, well, is there any competent evidence in this case to support what happened below, I think at most what we can find is that there is arguably an accident. Now, I'm not admitting that, and I'm going to argue against that here in a few minutes, but I think if you want to say, okay, we've got some conflicting testimony on the basis of an accident, maybe, but where are we on the issue of causation? And that's the point I think we break down to. We're going to look at application of the chain of events causation theory versus a medical opinion that says this is not related. And I think there are two components, and you pointed this out, Justice Harris. There are two components to his opinion. Dr. Hodder talks about the back, and then he talks about these ancillary or additional neurological components. And so he's looking at this individual and saying, based on the conditions that I'm seeing in my IME exam, I don't find anything in this that relates back to this accident that he's relating to me. Now, I think on the causation aspect, again, when we start walking down the path of analyzing a case on causation, obviously they've admitted they don't have a medical opinion to the contrary. So when we look at chain of events, we can say, okay, can we apply chain of events to this case? And the court's correct. We have to have a condition of good health followed by accident followed by bad health. But in this case, we've got several events that won't allow us to make that conclusion that he's in good health, and these were overlooked by the commission. You're right when you point out that the car accident occurred when he was 12 or 13 years old. One of the justices mentioned that. How old was he at the time of the hearing? Twenty-five. I think it was in his 40s. So it's 12 to 13 years old. No, 25. I'm sorry. Either way, my point on that is the condition that the chiropractor diagnosed, when we look at the various findings on his SOAP report, is a stenosis condition. That's the number one diagnosis until we get towards the end when he starts talking about pain and discomfort in the lower extremities. Stenosis is something that we would expect to see from a degenerative condition that we can look back at the prior auto accident. Now, I think that's important. The second thing is the claimant admitted at page 24 of the arbitration testimony that I had pain in my back and shoulder blade for a couple months prior to the January accident, and he says this was from pushing a lawnmower. Now, when you couple that with, and I'm not bleeding into the accident argument, but when you couple that with the chiropractor's medical records that talk about the onset of the symptoms being two weeks prior, which was a week before this accident, now we've got a very detailed murkiness, I think, about what this individual's condition was. So I guess the court has to ask itself, are we going to allow commission to apply a chain of events theory where we've got clearly a situation where the guy's not in good health, and we're going to weigh that against a medical opinion from a doctor that says that this event is not related. Let me just say, you would obviously admit as an experienced attorney that you don't need a supporting medical opinion to sustain the award, correct? Not in all cases. You're right. Absolutely. So, and you recognize the chain of events as a legitimate basis upon which to commission to base its finding. What you are saying is the chain of events analysis is not proper here because the good health issue component is flawed. Absolutely. That's exactly where it comes down to. And if we throw that out, what we have is we have unrefuted testimony from Dr. Harter that says it's not related. The fact that somebody says, you know, my back was bothering me some for a couple of months before the accident, does that mean they're not in good health? I think it does, and particularly where, You see what I'm saying. Okay. I mean, there are a lot of people who are going around and their back is in a twinge here or there, but they go for years, no problem. But something happened here that really changed that. Well, first of all, it wasn't years here. It was just a couple months. Second of all, I would have a wholly different opinion of this if we had prior back complaints and we were talking about the development of a knee injury. But we have prior back complaints in the area where he's claiming that this injury manifested itself. And I think that's very, very significant in this case, so that we cannot conclude on this record that this gentleman was in good health. And I think that's really what this case boils down to, is was he in good health prior to the accident? It doesn't mean he was completely disabled and able to work. It just means he was in a condition that wasn't considered to be good health. And I think that's important. Well, he had a prior degenerative condition. I agree with that. Based upon stenosis and so forth. Yes, absolutely. But that doesn't mean he can't recover. And if there is a clear distinction between the situation of that degenerative condition before and after the accident, why would he change his analysis? I mean, I'm having trouble with this black and white issue. But if he has any complaint, he's not in good health. This is the problem that I have with the chain of events theory, the chain of events theory causation being applied in a case like this. And this is why. It doesn't mean he can't recover. I will agree with you. But what it means is they've got to come in with a medical opinion in that case. If the individual has a prior condition and it involves the same area we're talking about in our case, then bring in a doctor that says, I'm aware of that condition, but given what I've been told, this is causally related to the alleged work accident. That's how this is handled. Was it the same area of the back? Part of it was. Part of it was the shoulder blade area, and then part of it was. I think it kind of overlapped a little bit. Yes? Was he very specific as to the location in terms of his prior back complaints? You're referring to the other accident or the mower? No, the mower. The mower. The mower, he says his shoulder blades and he says his back and shoulder blades. So that's about the best we can do. As far as the auto accident, we don't know. He says back. But I think, again, I'm not saying that an individual in a case like this cannot recover. I think that would be an overstatement on my part. What I am saying is in a case like this, you can't just rely on the chain of events theory. So you want us to hone in on the good health component? You have to. I think you have to. You absolutely have to. Now, we also raise the issue of, well, before I leave the causation, I also want to point out, again, we're talking about two different types of conditions that are evaluated here at arbitration. The individual presents with his back complaints, and he's got this whole other source of problems that he's related. And Dr. Hodder says, I think there's a serious neurological condition going on here. We've got two different things. And I think it's important to say, what in this case, if we adopt the argument about the chain of events theory being applicable in this case, does that apply only to the back, or does that get us to the whole ballgame of the neurological problems? Clearly, this guy, the way he's sitting in front of Dr. Hodder, is presenting with a whole host of problems. Many of these problems appear to have nothing to do with any kind of what we would normally associate with a back injury. He's sitting there. He's in a wheelchair. He's got a back strain. He's in a wheelchair. He's walking with crutches or a cane. But yet, he's got all these findings here of the weakness, the shakiness, the tremulous, the weakness in the lower extremity, the unexplained rapid eye movement. He's got other things going on. And I don't know how you could use a chain of events theory to say that that condition, as presented, is related to if you assume that something happened to the back strain. It just doesn't make any sense. There's no medical to support it. And I don't think you can relate that. There's nothing that ties that in. What did the commission order you to pay for? You have to go back and get their exact wording. Reasonable Medical, Chiropractor, lots of prescriptions, the MRI, and that's where they left it. Well, I mean, this was a 19B, right? It's going back. Well, okay. You get a perfect opportunity if we were to reverse it. You get a perfect opportunity to argue for reasonable medical expenses. Well, if this court concludes that this decision is all fine and dandy, then I'm stuck with a case where we've got an arguable opinion that says his condition is the time he's presented. Because the condition of his back. No, his condition that he's presented at arbitration was related. And if I come back, if I lose this and we go back and we try this and we come back with a full case and I'm back up before you again, if I try to make the argument, well, all these other conditions, Your Honor, are not related to his employment, you're going to say, Counselor, you were up here before and that issue wasn't cited. Wait a minute. What I'm saying is when the commission said his condition, what condition were they talking about? They're talking about the condition of his back. They're not talking about any neurological problem. They're also talking about his ability to return to work. And I think it's clear from Dr. Harder's opinion that this gentleman is disabled and unable to work because of his neurological condition. That's Harder's opinion. They chose a chain of events over Harder's opinion. So now the question becomes, when it goes back, if it goes back, because it was a 19B, it would have to go back. There's going to be an argument, number one, on what medical expenses this man incurred is reasonably related to the back injury that he filed an application for adjustment claim about. And if he's being treated by a neurologist because he has multiple sclerosis, Mr. Elwood, I'm absolutely convinced you're going to be able to make a very, very good argument. It has nothing to do with the condition for which he was awarded damages. And second of all, if he can't work, there's a larger question is, why can't he work? And if he can't work because of his back, you've got a problem. If he can't work because he's got multiple sclerosis, I don't think you have a very big problem. So it occurs to me that all of this depends upon what the commission meant when they said that his condition is causally related. What condition were they speaking of? They couldn't be speaking about anything other than his back. That's what he sued for. I guess I disagree with that. And I can see myself standing here with them making the exact arguments that I'm arguing to you right now. Is there going to say you had your chance to address this on causation of the 19B, and you lost, and now you have the whole ballgame? And that's why I say, if this court, if you adopt the opinion that there's an accident, and you find that there's a back strain here, then limit the opinion to that. Or remand it for consideration of whether the additional conditions presented are causally related to this employment. But don't box me in. Please don't box me in if I've got to go back and retire this case for the future. The commission specifically said they concluded that repeated slips and twists led to claimant's back injury, and a chain of events analysis supported a causal connection on that. And this is a quote with respect to Hodder's opinion. They say, with respect to claimant's back condition, Dr. Hodder largely based this. I mean, the commission's talking about the back injury. I mean, I don't think there's anything in their decision that says that they believe, I get postsclerosis, or any kind of a neurological problem is related to an accident. I agree. They don't say anything about MS or ALS being related. But I do think that his inability to work, I don't think it's clear why they're saying his inability to work. And I guess that's a concern that we have in this case. But again, when we get back to the original issue, does the chain of events theory apply here? And I don't think it does because there's not good health. It doesn't mean it can't apply in other cases, and it doesn't mean that somebody with a prior back condition can't have a compensable accident. It just means that in that fact scenario, in the future cases, you need to walk in with a doctor that can causally relate it with a medical opinion. And they didn't do that here. And I think that's what distinguishes this case. You're not going to step on any prior cases. You're not going to foreclose the ability to use a chain of events analysis. You're not going to harm a petitioner's burden of proof in any type of a case. You're just saying to the petitioners, in this situation, you've got to bring in a doctor. And that's why I said earlier, I have a problem with these cases when you have a back injury. Backs are complex, and you know that from the cases that you address. Backs are complex. And to just apply a chain of events theory in this type of case, I don't think we can do that. We have to have a doctor with a medical opinion that says it's related. And it would be that simple. We wouldn't. I would have a lot harder argument to make. Did you say you wouldn't be here? I might not be here. I may not be here on that. So like I said, there's an accident argument based on what was contained. He was about to. Pardon me? There's an accident argument based on the chiropractor's records. I do think it's interesting that the chiropractor's record do say that the onset of the low back and the mid back pain started a week before. And he does relate it to a bout with the flu. The petitioner admits he has the flu. I think there's serious credibility issues in this record, the finding of symptom magnification, the whole bit about whether there were 200-plus. That's 50 an hour. Commissioner said he was speaking figuratively. He didn't really mean 200. He meant numerous. Words mean something. And the case I cited is when you tell a doctor something. Words mean a lot to us. Do you think it means a lot to a car dealer and detailer? But it should mean something to a person who's talking to a doctor about trying to legitimately give them help. And that's what the Shell Oil case says. And that's what we have here. Thank you. Thank you. Thank you, Mr. Elder. Mr. Young? Just real quick. Yeah, well, do you want to address that? I mean, I think Mr. Elder was very detailed about that chain of events. Particularly the good health. Yeah. No, yeah, absolutely. Is that at arbitration the petitioner testified that he was trying to push a lawnmower and that he felt pain in his shoulder and back. It did not necessitate medical treatment. He was working full duty. He had no issues. He just stated that he had had some of those pain complaints as any of us would from probably pushing a lawnmower at that time. But he was having no problems at the time or day of the injury. And he wasn't having any prior medical treatment except in 1997 when he had the car accident. I think based on those facts, he was in good health at that time. Do you agree you'd be in a lot stronger position if you would have got a causation of pain? Yes, I would be in a stronger position. It's kind of risky to rely on chain of events against a doctor's opinion otherwise. No, absolutely. But I think in this case, I would argue that he was in good health at the time of the accident and he had consistent medical treatment with a consistent history of injuring himself at work. And based on that consistent history, I think a chain of events, finding a chain of events in this case is not against the manifest way to the evidence. Now, you do agree with Mr. Elwood. We're only talking about an injured back here. No, absolutely. I think the IV... In the words of the old song, Mr. Elwood says, don't fence me in. No, I agree that at this point... Is that how the song goes? It's a low back strain sprain. No, absolutely. All right. Thank you. Thank you, counsel, both for your arguments. This matter will be taken under advisement. This position shall issue at a public hearing in recess until 1.30.